**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1971**

MOUNTAIN VALLEY PIPELINE, LLC,

Petitioner,

v.

NORTH CAROLINA DEPARTMENT OF ENVIRONMENTAL QUALITY;
MICHAEL S. REGAN, in his official capacity as Secretary of the North Carolina
Department of Environmental Quality; S. DANIEL SMITH, in his official capacity
as Director, Division of Water Resources, of the North Carolina Department of
Environmental Quality,

Respondents.

SIERRA CLUB; APPALACHIAN VOICES; CENTER FOR BIOLOGICAL
DIVERSITY; HAW RIVER ASSEMBLY,

Intervenors.

On Petition for Review of a Decision of the North Carolina Department of Environmental
Quality. (FERC Docket No. 20181638)

Argued: January 26, 2021                                         Decided: March 11, 2021

Before GREGORY, Chief Judge, WYNN, and THACKER, Circuit Judges.

Petition for review granted; vacated and remanded by published opinion. Chief Judge Gregory
wrote the opinion, in which Judge Wynn and Judge Thacker joined.

**ARGUED:** Catherine E. Stetson, HOGAN LOVELLS US LLP, Washington, D.C., for Petitioner. Taylor Crabtree, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Respondents. **ON BRIEF:** Sean Marotta, HOGAN LOVELLS US LLP, Washington, D.C., for Petitioner. Joshua H. Stein, Attorney General, Asher P. Spiller, Assistant Attorney General, Brenda Menard, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Respondents. Jean Y. Zhuang, Alex J. Hardee, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, for Intervenor Haw River Assembly. Benjamin A. Luckett, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Intervenors Sierra Club, Appalachian Voices, and Center for Biological Diversity.

———————————

GREGORY, Chief Judge:

Mountain Valley Pipeline, LLC ("MVP") seeks to build a natural gas pipeline running through North Carolina and its rivers, streams, and wetlands. To do so, MVP needed to obtain a Clean Water Act certification from the State's Department of Environmental Quality (the "Department"). The Department denied MVP the certification, and MVP petitioned this Court for relief. On appeal, we hold that the Department's denial is consistent with the State's regulations and the Clean Water Act. Nevertheless, the Department did not adequately explain its decision in light of the administrative record. Thus, we grant the petition, vacate the denial, and remand to the agency for additional explanation.

**I.**

MVP proposes to build the Southgate Project, a natural gas pipeline stretching 75 miles from Chatham, Virginia to Graham, North Carolina. The Southgate Project is meant to be an extension of MVP's Mainline Project—a separate pipeline, still under construction—that would deliver natural gas from sources in West Virginia, Ohio, and Pennsylvania. Approximately 48 miles of the Southgate Project, or nearly two-thirds, would cross through North Carolina and more than 200 of the State's rivers, streams, and wetlands, some of which contain fisheries or supply drinking water.

Construction of the pipeline would have several temporary and permanent effects on those bodies of water. Where the proposed pipeline would cross a stream, MVP would dam the stream, dry up the area, and pump or pipe the stream to redirect its flow. MVP

3

would then strip vegetation from the streambed and banks, dig a trench, and lay the pipe. Once done, MVP would backfill the streambed, re-stabilize it, and allow water to flow once again. But by clearing vegetation and grading along the stream banks, the pipeline's construction would expose additional ground to erosion, increasing the sediments that spill into the water. This increasing sedimentation, in turn, may alter the water's chemical balance or decrease its dissolved oxygen, harming aquatic wildlife. The sedimentation may also harm aquatic wildlife by decreasing light penetration, killing organisms that rely on photosynthesis to produce oxygen. And the damming and drying of streams during construction would disrupt the movement of fish and other organisms by imposing physical barriers to upstream or downstream migration. These effects on the State's rivers and streams would primarily be "[t]emporary and localized impacts." J.A. 848.

For larger or more sensitive bodies of water, MVP proposes drilling a hole beneath the body of water to place the pipeline. To do this, MVP must excavate a pit nearby, which again may increase erosion and sedimentation. And there is risk that drilling fluid will escape into the surface waters, or that the drilled hole might collapse, causing the waterbed to collapse as well.

Furthermore, the Southgate Project's proposed route would cross through over twelve acres of wetlands, carving a 75-foot construction pathway in the process. As with streams, MVP would dry the area, dig the trench, lay the pipe, and backfill the land. In addition to increasing water sedimentation, the Project would permanently remove forests from two acres of wetlands to create paths for the pipeline's maintenance easements and access roads.

4

Finally, the Southgate Project would impact the Jordan Lake area, which "provides drinking water to approximately 500,000 people and provides recreational swimming, boating and fishing opportunities to the area." J.A. 840. While the pipeline itself would not cross the Jordan Lake waters, the pipeline would affect the Jordan Lake's riparian buffer zones—zones of neighboring wildlife vegetation. The vegetation in these buffer zones protects water quality by stabilizing stream banks, mediating the temperature of water, and removing sediment and pollutants before they enter the water. *See* State of North Carolina, Envtl. Mgmt. Comm'n, Dep't of Envtl. Quality, Study of the State's Riparian Buffer Protection Program Pursuant to SL 2015-246 (May 11, 2016), *available at* https://perma.cc/24UC-5ZU7 (saved as ECF opinion attachment). By removing vegetation from these riparian zones, the pipeline's construction would diminish this natural layer of protection. The proposed pipeline would thereby affect more than 400,000 square feet of riparian buffers, though the Federal Energy Regulatory Commission claims that "[d]ue to the distance between the Project and the Jordan Lake impoundment and the proposed surface water protection measures, no impacts would be expected to Jordan Lake's water quality or function." J.A. 840.

In its environmental impact summary, the Federal Energy Regulatory Commission ("FERC") concluded that "[m]ost adverse environmental impacts would be temporary or short-term during construction, but some long-term and permanent environmental impacts would occur on forest and wetlands." J.A. 701.

## A.

Under the Natural Gas Act, a party seeking to build or operate a natural gas pipeline must acquire a certificate of public convenience and necessity from FERC. 15 U.S.C. § 717f(c)(1)(A). When a party requests such a certificate, FERC undertakes an environmental review of the proposed project under the National Environmental Policy Act and the Natural Gas Act. *See* 42 U.S.C. §§ 4321 *et seq.*; 15 U.S.C. §§ 717 *et seq.* In this process, FERC accepts input from the public and produces an environmental impact statement. While the Natural Gas Act "largely preempts environmental regulation of interstate natural gas pipelines by states," the statute expressly preserves State authority to regulate pipelines under the Clean Water Act. *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 388 (4th Cir. 2018) (quoting *Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot.*, 833 F.3d 360, 368 (3d Cir. 2016)); *see also* 15 U.S.C. § 717b(d).

In this allocation of authority, Congress recognized the essential role that States must play in protecting their own waters. Congress enacted the Clean Water Act in part to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources." *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 647 (4th Cir. 2018) (quoting 33 U.S.C. § 1251(b)) (emphasis omitted); *see also Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 265 n.9 (4th Cir. 2001) ("Under the CWA, states have the primary role in promulgating water quality standards.").

6

North Carolina exercises this authority through its Department of Environmental Quality. N.C. Gen. Stat. § 143-211(c); *see also id.* § 143-215.3(c); 15A N.C. Admin. Code 2B. 0100–.0300. The Department, in turn, has promulgated various State water quality standards. One standard, the State's antidegradation regulation, protects existing uses of surface waters. *See* 15A N.C. Admin. Code 2B .0201(a). This regulation prohibits water pollution that "preclude[s] any . . . uses[1] on either a short-term or long-term basis," unless otherwise permitted by certification. 15A N.C. Admin. Code 2B .0201(f), .0211(2). Another water quality standard establishes various limitations to protect certain riparian buffer zones. *See* 15A N.C. Admin. Code 2B .0262, *et seq.*

Besides its implementation of water standards, the Department also reviews applications for certification under Section 401 of the Clean Water Act. *See* 33 U.S.C. § 1341(a); 15A N.C. Admin. Code 2H. 0506. Under Section 401, an entity seeking federal permits for activity that may pollute a State's waters must acquire State certification that the activity will comply with applicable water laws, including the State's water standards. 33 U.S.C. § 1341(a); *see also* 40 C.F.R. § 131.4(a). And if a State grants the certification but with conditions, those conditions "shall become" conditions of the federal license. 33 U.S.C. § 1341(d).

---

[1] All fresh waters throughout the State have designated uses of aquatic life propagation and survival; maintenance of biological integrity; secondary contact recreation (e.g. boating); and agriculture. 15A N.C. Admin. Code 2B .0211(1).

**B.**

In May 2018, MVP sought FERC authorization for the Southgate Project. FERC issued a notice of intent to prepare an environmental impact statement, soliciting public comments. That same year, MVP submitted a Section 401 certification application to the North Carolina Department of Environmental Quality. Because MVP had not finalized the Project's route, and because FERC had not completed a draft environmental impact statement, the Department denied this initial application.

FERC issued its draft environmental impact statement in 2019, and a year later, the agency issued its final environmental impact statement and a certificate of public convenience and necessity for the Southgate Project. However, FERC's certificate included a key condition. Because the Southgate Project depended upon the Mainline Project, and because the Mainline Project had several of its permits invalidated by this Court, FERC would permit construction of the Southgate Project only once MVP acquired all required federal permits for its Mainline Project.

MVP reapplied for a Section 401 certification from the Department. The Department began review of the application, requesting public comments and scheduling a public hearing. During this process, the Department requested information regarding the permits, litigation, and enforcement actions affecting MVP's Mainline Project and how these developments would affect the Southgate Project. In response, MVP acknowledged a number of lawsuits hindering progress on the Mainline Project, including *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582 (4th Cir. 2018) (vacating and remanding U.S. Forest Service's decision amending the National Forest Land and Resource Management Plan for

8

the Mainline Pipeline); *U.S. Army Corps of Eng'rs*, 909 F.3d at 639 (vacating the U.S. Army Corps' authorization of the Mainline Project under Nationwide Permit 12 and suggesting that "an individual permit would likely be necessary"); and *Wild Va. v. U.S. Dep't of the Interior*, No. 19-1866 (4th Cir. Oct. 11, 2019) (challenging the U.S. Fish and Wildlife Service's Biological Opinion and Incidental Take Statement for the Mainline Project). MVP also described several enforcement actions against the Mainline Project by Virginia and West Virginia due to the Project's violation of various permits and State environmental laws.

After conducting a public hearing, the Department's hearing officer issued a report on MVP's Section 401 certification application on August 11, 2020. Addressing public comments,[2] the hearing officer discussed several common subjects, including climate change, cumulative environmental impacts, project purpose, environmental justice, sediment and erosion control, the effect of construction on streams and water, and the project's reliance on the completion of the Mainline pipeline. For some comments—such as those questioning the economic need for the Southgate Project—the hearing officer noted that the comments were "outside the evaluation criteria established in N.C. Administrative Code for the review of 401 Water Quality Certifications and Buffer Authorizations." *See, e.g.*, J.A. 1342. The hearing officer also observed that "[t]he

---

[2] The hearing officer recorded 22 verbal comments and 1,725 written comments on the proposed pipeline—of the written comments, all but three opposed the Southgate Project.

majority of comments received raised concerns over the degradation of ground and surface waters as a result of the construction and operation of the pipeline." J.A. 1346.

The hearing officer then offered his recommendations, addressing each of the individual criteria for certification under 15A N.C. Admin. Code 02H .0506 (2019). When considering whether the Southgate Project would sufficiently minimize its effects on surface waters, the hearing officer determined that "MVP has minimized impacts to surface waters and wetlands to the greatest extent practical," but that certain "impacts to surface waters and wetlands are required due to spatial considerations, natural features and the purpose of the project." J.A. 1349, 1351. Consequently, the officer recommended that any certification impose conditions requiring MVP to adhere to its commitments and otherwise engage in specific practices to ensure that the pipeline's effects on water remain minimal. The officer also wrote that "[t]he project is not expected to violate water quality standards if the certification is issued and if the conditions in the 401 Water Quality Certification are fully complied with by the applicant (or its successor)." J.A. 1353.

However, the hearing officer also discussed whether the Southgate Project "[h]as no practical alternative[s]," J.A. 1347, 1356, a separate requirement in both the State's 2019 certification regulation[3] and the State's riparian buffer regulation. *See* 15A N.C. Admin. Code 2H .0267(11), .0506(b)(1) (2019). Here, the officer wrote:

> In the absence of the MVP Mainline pipeline's completion in Virginia, the
> MVP Southgate project has no independent utility. In essence, it would be a
> pipeline from nowhere to nowhere incapable of carrying any natural gas, and

---

[3] The certification regulation was revised after MVP submitted its certification application but two months prior to the Department's final decision. *See* 15A N.C. Admin. Code 2H .0506(b)(2) (2020).

10

certainly not able to fulfill its basic project purpose, while having no practical alternative. As such, prior to incurring any impacts to North Carolina natural resources, and to ensure that the maximum avoidance and minimization of impacts to North Carolina water and buffer resources occurs, a level of certainty regarding the completion of the MVP Mainline pipeline is required.

J.A. 1348. Thus, the officer recommended that the Department take one of two options: (1) issue a certification including the condition "that construction of the MVP Southgate pipeline (and its corresponding impacts) cannot occur until all legal ambiguities presently surrounding the mainline pipeline have been resolved, and all necessary permits and authorizations have been obtained"; or (2) deny certification. J.A. 1349; *see also* J.A. 1357–58 (recommending the same two options in the practical alternatives analysis relevant to the riparian buffer standards).

The same day the hearing officer issued his report, the Department issued its final decision, denying Section 401 certification for the Southgate Project. It determined that the Southgate Project "is inextricably linked to, and dependent upon" completion of the Mainline Pipeline Project. J.A. 1362. But because "several federal permits necessary for the construction of the MVP Mainline project have been suspended or are pending, with some in litigation," and because FERC had "issued a stop-work order on the currently incomplete MVP Mainline project," the Department explained that "[t]he uncertainty of the MVP Mainline project's completion presents a critical risk to . . . the fundamental purpose of MVP Southgate." J.A. 1363. Consequently, the Department wrote that "[c]ertification of this project, without further confidence that it can achieve its stated purpose, is inappropriate and allows for avoidable environmental impacts to water quality and protected riparian buffers." *Id.* Specifically,

11

The FEIS notes that most adverse environmental impacts of the MVP Southgate project would occur during construction. And that the MVP Southgate project has the potential to result in "sedimentation and turbidity, alteration or removal of instream and stream bank cover, stream bank erosion, introduction of water pollutants, water depletions, and entrainment of small fishes and fry during water withdrawals [which] could increase the rates of stress, injury, and mortality experienced by fish and other aquatic life." In addition, the project would unnecessarily risk impacting high-quality waters and protected and critical drinking water supplies of North Carolinians.

*Id.* Accordingly, the Department denied certification, as "[a]pproving construction activities and thereby allowing the most adverse environmental impacts—without certainty of the project's utility upon completion—is inconsistent with principles of minimization."

*Id.*

MVP timely petitioned this Court for review.[4]

**II.**

For the proposed construction of a natural gas pipeline, the United States Court of Appeals for that circuit "shall have original and exclusive jurisdiction over any civil action" challenging a State agency's decision "to issue, condition, or deny any permit . . . required under Federal law[.]" 15 U.S.C. § 717r(d)(1). We review North Carolina's Section 401 certification decision under the standards set forth in the Administrative Procedures Act

---

[4] This Court also permitted Haw River Assembly, Sierra Club, Appalachian Voices, and the Center for Biological Diversity to intervene and file a separate, joint brief.

("APA").[5]  *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 753 (4th Cir. 2019).  Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An action is arbitrary and capricious if the agency relied on factors outside those Congress intended it to consider; failed to consider an important part of the problem; offered an explanation contradicted by the evidence before the agency; or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Defs. of Wildlife v. Dep't of the Interior*, 931 F.3d 339, 345 (4th Cir. 2019) (internal quotations omitted).

"Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid."  *Id.* (quoting *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)).  That said, a court "must not reduce itself to a 'rubber-stamp' of agency action."  *Defs. of Wildlife*, 762 F.3d at 396 (quoting *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 601 (4th Cir. 2012)).  Rather, it "must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action."  *Defs. of Wildlife*, 931 F.3d at 345 (internal quotations omitted).

---

[5] This Court has questioned whether State standards might be more appropriate for review of State agency actions.  *See Appalachian Voices*, 912 F.3d at 753 n.1 (noting but declining to decide the issue); *Sierra Club*, 898 F.3d at 403 n.13 (same).  We need not decide the issue here because North Carolina's standards for reviewing State agency actions are materially identical to the APA's.  *Compare* N.C. Gen. Stat. § 150B-51(b) *with* 5 U.S.C. § 706(2).

## III.

### A.

MVP first argues that the Department's denial of certification was arbitrary and capricious because it did not comply with its own regulations. At the time of the application, the Department's regulations stated that the Department "shall issue a certification upon determining that" the proposed activity:

> (1) has no practical alternative under the criteria outlined in Paragraph (f) of this Rule;
>
> (2) will minimize adverse impacts to the surface waters based on consideration of existing topography, vegetation, fish and wildlife resources, and hydrological conditions under the criteria outlined in Paragraph (g) of this Rule;
>
> (3) does not result in the degradation of groundwaters or surface waters;
>
> (4) does not result in cumulative impacts, based upon past or reasonably anticipated future impacts, that cause or will cause a violation of downstream water quality standards;
>
> (5) provides for protection of downstream water quality standards through the use of on-site stormwater control measures; and
>
> (6) provides for replacement of existing uses through mitigation as described at Subparagraphs (h)(1) of this Rule.

15A N.C. Admin. Code 2H .0506(b) (2019). A proposed activity lacks practical alternatives if "the basic project purpose cannot be practically accomplished in a manner which would avoid or result in less adverse impact to surface waters or wetlands." 15A N.C. Admin. Code 2H .0506(f) (2019).

MVP contends that the Department's own hearing officer found these criteria to be satisfied. It points to the hearing officer's report, where he stated that the Southgate Project

14

"has minimized impacts to surface waters and wetlands to the greatest extent practical"; that "[u]pon successful completion of the restoration and monitoring activities, the streams, buffers, and wetland impact areas will continue to support existing uses of hydrology, vegetation, and aquatic and wildlife habitat"; and that "[t]he project is not expected to violate water quality standards if the certification is issued and if the [recommended] conditions in the 401 Water Quality Certification are fully complied with by the applicant (or its successor)." J.A. 1349–50, 1353. From these comments, MVP concludes that the State was required to issue certification.

But the hearing officer did not claim that the Southgate Project satisfied all certification criteria. Under the "no practical alternative" requirement, the pipeline fell short. Until the Mainline Project was complete—a milestone stalled by litigation—the hearing officer found that the Southgate Project's construction would produce unnecessary harm to the State's waters. "[P]rior to incurring any impacts to North Carolina natural resources," the hearing officer wrote, the Department should require "a level of certainty regarding the completion of the MVP Mainline pipeline" to "ensure [] the maximum avoidance and minimization of impacts to North Carolina water and buffer resources[.]" J.A. 1357. The Department's final decision reiterated this same reasoning. *See* J.A. 1362–63.

MVP acknowledges these observations by both the Department and its hearing officer, but it claims that such reasoning strays beyond the scope of the State's current certification regulation (made effective two months before the Department's final decision). Opening Br. at 24–28. The regulation had been revised, in part, to combine the

15

minimization and practical alternatives criteria into a single criterion that only required minimization "during and after project completion." 15A N.C. Admin. Code 2H .0506(b) (2020).[6] In response, the Department and Intervenors argue that the decision should be evaluated under the 2019 version of the certification regulation, "in effect for the vast

---

[6] In full, the revised Certification regulation states that the Department "shall issue" a 401 Certification "upon determining that the proposed activity will comply with state water quality standards, which includes designated uses, numeric criteria narrative criteria, and the state's antidegradation policy[.]" 15A N.C. Admin. Code 2H .0506(b) (2020). "In assessing whether the proposed activity will comply with water quality standards," the Department "shall evaluate" whether the proposed activity:

(1)     has avoided and minimized impacts to surface waters and wetlands to ensure any remaining surface waters or wetlands, and any surface waters or wetlands downstream, continue to support existing uses during and after project completion;

(2)     would cause or contribute to a violation of water quality standards;

(3)     would result in secondary or cumulative impacts that cause or contribute to, or will cause or contribute to, a violation of water quality standards;

(4)     provides for replacement of existing uses through compensatory mitigation as described in Paragraph (c) of this Rule;

(5)     for Class SWL wetlands, is water dependent and requires access to water as a central element of its basic function. Projects funded by government agencies may be exempted from this requirement; and

(6)     for Class UWL wetlands and wetlands that are habitat for state or federally listed threatened or endangered species, is necessary to meet a demonstrated public need.

*Id.*

16

majority of the application period." Resp. Br. at 39–41; *see also* Intervenors' Br. at 28–36.[7]

We need not decide which version of the certification regulation to consider. Even under the current version of the regulation, the Department's minimization reasoning is consistent with its water quality standards: namely, its riparian buffer rules. The current regulation incorporates the riparian buffer rules by requiring the Department to consider whether the project "would cause or contribute to a violation of water quality standards." 15A N.C. Admin. Code 2H .0506(b)(2) (2020). Relevant here, North Carolina's "Jordan Rules" protect the riparian buffers by the Jordan Reservoir, which supplies water to several municipalities in North Carolina. *See* 15A N.C. Admin. Code 2B .0267(1). The Jordan Rules establish a fifty-foot riparian buffer around the Jordan waters, and they permit impacts upon the buffer only when there are "no practical alternatives" to the project. 15A N.C. Admin. Code 2B .0267(4), (10)(b)–(c). And a project has "no practical alternatives" if "[t]he basic project purpose cannot be practically accomplished in a manner that would better minimize disturbance, preserve aquatic life and habitat, and protect water quality." 15A N.C. Admin. Code 2B .0267(10).

The Department's decision is thereby consistent with the water quality standards listed in its Jordan Rules. The Department noted that the Southgate Project's basic purpose—conveying fuel from the Mainline Project—could be practically accomplished

---

[7] The Department also claims that its decision is consistent with the 2020 revision of the regulation, arguing that the revision did not narrow or change its avoidance and minimization requirements. Opening Br. at 42.

17

in a manner that would better minimize disturbance to water quality: by building the Southgate Project only once the Mainline Project receives the necessary permits. Doing so would ensure that the State avoids premature or unnecessary harm to its waters.

In reply, MVP argues that the Department did not invoke the riparian buffer rules as a basis for its denial and that those rules are not applicable water quality standards. Reply Br. at 14. Neither argument is correct. The Department's denial letter expressly invokes the Southgate Project's effects on riparian buffers: "Certification of this project, without further confidence that it can achieve its stated purpose, is inappropriate and allows for avoidable environmental impacts to water quality and *protected riparian buffers*." J.A. 1363 (emphasis added). And the riparian buffer rules are clearly applicable water quality standards[8]: "The purpose of this [Jordan] Rule shall be to protect and preserve existing riparian buffers throughout the Jordan watershed . . . to maintain their nutrient removal and stream protection functions . . . . [and] help protect the water supply uses of Jordan Reservoir and of designated water supplies throughout the Jordan watershed." 15A N.C. Admin. Code 2B .0267(1).

MVP also claims that the Department's practical alternatives analysis ventured into a "freeform weighing" of the pipeline's benefits against its costs. But the Department does not dispute the merit of the Project. It did not weigh, for instance, the pipeline's economic

---

[8] MVP claims that the Jordan Rules are not State water quality standards solely because they are not listed in an EPA guidance document. *See* Reply Br. at 14. But the cited document lists the State's water quality standards as the "Surface Water and Wetlands Standards" in subchapter 2B. 0100–.0300, a section that includes the Jordan Rules in 2B.0267.

18

benefits or the energy it would produce. Rather, the Department had to consider the pipeline's function to assess the reasonable range of alternatives that would minimize its adverse impact on water while still allowing the pipeline to work as intended. While an agency's analysis often takes the form of considering spatial alternatives (such as the pipeline's path),[9] here, the Department's analysis considered a temporal alternative (postponing construction of the Southgate Project until the predicate Mainline Project completes the permitting process). As the Department points out, it denied certification without prejudice to MVP re-submitting its application at a later time. Thus, the Department properly denied certification, as it found that the temporal adjustment constituted a practical alternative that would better minimize harm to the State's waters.

**B.**

Next, MVP contends that the Department exceeded its statutory authority under the Clean Water Act because the Department based its decision on policy goals unrelated to water quality. Opening Br. at 30–36. But for the same reasons that the Department's decision is consistent with its water standards, its decision is consistent with the Clean Water Act.

The Clean Water Act "requires each State, subject to federal approval, to institute comprehensive water quality standards establishing water quality goals for all intrastate waters." *PUD No. 1 of Jefferson Cnty.*, 511 U.S. at 700. While a State's authority under

---

[9] *See, e.g.*, *Constitution Pipeline Co., LLC v. N.Y. State Dep't of Envtl. Conservation*, 868 F.3d 87, 101 (2d Cir. 2017) ("A state's consideration of a possible alternative route that would result in less substantial impact on its waterbodies is plainly within the state's authority.").

19

the Clean Water Act "is not unbounded," *id.* at 712, the Supreme Court recognizes that a State's antidegradation rules—rules to maintain existing, beneficial uses of water—are appropriate requirements under the Clean Water Act. *Id.* at 713. North Carolina's riparian buffer rules fall plainly within that authority. *See* 15A N.C. Admin. Code 2B .0267(1) ("The purpose of this Rule shall be to protect and preserve existing riparian buffers throughout the Jordan watershed . . . to maintain their nutrient removal and stream protection functions . . . . [and] help protect the water supply uses of Jordan Reservoir and of designated water supplies throughout the Jordan watershed."); *see also* Envtl. Prot. Agency, EPA-841-B-05-003, National Management Measures to Protect and Restore Wetlands and Riparian Areas for the Abatement of Nonpoint Source Pollution (2005) (explaining how "[w]etlands and riparian areas play a significant role in protecting water quality and reducing adverse water quality impacts").

Additionally, the State's minimization requirements flow from the Clean Water Act. The EPA's regulations specify that States must engage in minimization analysis as part of their antidegradation rules. "Before allowing any lowering of higher water quality," States must "find, after an analysis of alternatives, that such a lowering is necessary to accommodate important economic or social development . . . . The analysis of alternatives shall evaluate a range of practicable alternatives that would prevent or lessen the degradation associated with the proposed activity." 40 C.F.R. § 131.12(a)(2)(ii). Under Section 404 of the Clean Water Act, the EPA and U.S. Army Corps have also issued regulations using similar language, stating that a permit should not issue if, among other things, "practicable, environmentally superior alternatives are available" or "appropriate

20

and practicable steps have not been taken to minimize potential adverse impacts[.]" 40 C.F.R. § 230.10; *see also James City Cnty. v. E.P.A.*, 12 F.3d 1330, 1333 (4th Cir. 1993). Thus, North Carolina's minimization regulations are consistent with the Clean Water Act, which is replete with similar language.

MVP argues that the Department exceeded its statutory role by stepping into FERC's shoes and making a judgment about the Southgate Project's public convenience and necessity. Opening Br. at 30–35. To MVP, any proposed project would have some potential impact on water; thus, a State could reject any project by invoking this hypothetical risk when the State was in fact motivated by concerns with the project's viability or utility. But this argument assumes MVP's premise that the Department's decision rested on weighing the costs and benefits of the Project. As explained above, that is not the case. The Department considered the Southgate Project's function only to determine the reasonable range of alternatives that would minimize its adverse impact on water while still accomplishing its function. Nor is such reasoning without limit. To deny certification under a practical alternatives requirement, a State's decision must be grounded in impacts to water; the alternatives considered must be practical; the consideration of alternatives must be reasonably consistent with the administrative record; and the agency's decision must not be arbitrary and capricious. By invoking such analysis here, the Department acted within the boundaries of the Clean Water Act.

To be clear, FERC plays an important part in reviewing any proposed pipeline. But the Natural Gas Act expressly preserves States' duties under the Clean Water Act, and

FERC's powers cannot sideline States from protecting their own waters. *See Sierra Club*, 898 F.3d at 388.

MVP also cites two State court cases rejecting agency actions as beyond their statutory authority. But both arose in different circumstances. In *Commonwealth Power Co. v. Department of Natural Resources*, the Michigan Court of Appeals reversed the State's denial of a Section 401 certificate on the grounds that the applicant refused to submit a study on a proposed hydroelectric power plant's effects on fish mortality. 2000 WL 33521869, at *2 (Mich. Ct. App. Mar. 21, 2000) (per curiam). There, the court held that the agency exceeded the bounds of its authority by ordering a study on fish mortality because the State "did not know or did not express what level of fish kill was acceptable or what type of protective measures were necessary to maintain the proper 'use' of the particular river for particular species of fish." *Id.* By contrast, North Carolina's water standards have set a clear standard for the degree of acceptable impact on its water and riparian buffers: the least amount practicably possible.

In *Summit Hydropower v. Commissioner of Environmental Protection*, the Connecticut Superior Court reversed the State's denial of a Section 401 certificate because the State denied it for aesthetic reasons. No. CV91050 26 43, 1992 WL 175241, at *12 (Conn. Super. Ct. July 20, 1992) ("The enabling statutes do not give the DEP authority for water quality regulations based on section 22a-426 to consider aesthetics in viewing the water."), *rev'd on other grounds*, 629 A.2d 367 (Conn. 1993). Here, however, the Department made its decision, not for aesthetic reasons, but for the express aim of preventing needless harm to the State's rivers, streams, and wetlands.

22

Last, MVP claims that the Department's denial was arbitrary and capricious because it failed to adequately explain its decision. Specifically, MVP argues that the Department: (1) did not respond to MVP's analysis for why its Mainline Project would receive the appropriate certification; (2) did not cite the water quality standards that the Southgate Project would purportedly violate; (3) did not explain its disagreement with the hearing officer's findings; and (4) did not explain why the Department chose to deny MVP's application rather than granting the Southgate Project a certificate conditioned upon the Mainline Project receiving all necessary permits. The Department's decision adequately explained its concerns with the Mainline Project and the adverse effects of the Southgate Project. But it failed to address the hearing officer's minimization findings and explain why it chose to deny certification rather than granting it conditionally.

First, MVP claims that the Department did not address the company's assurances that it was in the process of acquiring the necessary permits for its Mainline Project. Opening Br. at 39–40. But the Department adequately explained its concerns with the uncertainty surrounding the Mainline Project, as the information disclosed by MVP revealed that "several federal permits necessary for the construction of the MVP Mainline project have been suspended or are pending, with some in litigation." J.A. 1363. Moreover, the Department observed that FERC had issued a stop-work order on the Mainline Project. *Id.* Taking these facts together, the Department determined that "[c]ertification of this project, without further confidence that it can achieve its stated

23

purpose, is inappropriate and allows for avoidable environmental impacts to water quality and protected riparian buffers." *Id.*

MVP insists that the Department should have addressed a chart MVP provided and its representations that it was working diligently to obtain all permits for the Mainline Project.[10] Opening Br. at 39–40. MVP also claims that the Department never explained its criteria for what constituted an unacceptable degree of uncertainty. Reply Br. at 25. But there is no requirement that the Department comment on every pending certificate and lawsuit, individually, to observe that the slew of suits and missing permits poses a barrier to the Mainline Project's completion. *See U.S. Forest Serv.*, 897 F.3d at 597 ("It is of course always possible to explore a subject more deeply and to discuss it more thoroughly."). Nor is there a requirement that the Department establish a quantifiable metric for declaring a project to be too risky, especially when observing that a predicate project simply has not obtained the requisite certification. So long as the agency "provides an explanation of its decision that includes a rational connection between the facts found and the choice made, its decision should be sustained." *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014) (cleaned up). The Department's explanation provided that rational connection.

---

[10] MVP also cites the fact that FERC did eventually lift the Mainline Project's stop-work order. But this happened after the Department's decision, and we review the agency's decision based only on the administrative record before it. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978).

Second, MVP suggests that the Department's decision is inadequate because "the Department does not cite—much less analyze—any specific North Carolina water-quality standard the Southgate Project might violate."[11]   Opening Br. at 34–35.   But the Department did use language tracking North Carolina's minimization and avoidance provisions.   The Department explained that the Southgate Project as proposed is "inconsistent with principles of minimization," as it "allows for avoidable environmental impacts to water quality and protected riparian buffers."   J.A. 1363.   The Department further stated that the Southgate Project could cause "sedimentation and turbidity, alteration or removal of instream and stream bank cover, stream bank erosion, introduction of water pollutants, water depletions, and entrainment of small fishes and fry during water withdrawals [which] could increase the rates of stress, injury, and mortality experienced by fish and other aquatic life."   *Id.*   And the Department observed that "the project would unnecessarily risk impacting high-quality waters and protected and critical drinking water supplies of North Carolinians."   *Id.*   This analysis tracks the requirements of the State's riparian buffer rule and its antidegradation requirements.   *See* 15A N.C. Admin. Code 2B .0201(f), .0211(2) (declaring a violation of water quality standards where activity produces pollution that "preclude any [designated] uses on either a short-term or long-term basis"); 15A N.C. Admin. Code 2H .0267(11) (permitting a project affecting riparian buffers only

---

[11] Though MVP offers this point in its argument as to why the Department exceeded its statutory authority, the argument challenges the adequacy of the Department's explanation.

25

if "[t]he basic project purpose cannot be practically accomplished in a manner that would better minimize disturbance, preserve aquatic life and habitat, and protect water quality").

True, the Department's decision did not offer direct citations to the North Carolina general statute or administrative code. Regardless, we may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Roe v. Dep't of Def.*, 947 F.3d 207, 220 (4th Cir. 2020) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974)). Even without direct citations to State code, we can reasonably discern from the Department's language that it relied on the State's riparian buffer rule and its minimization and avoidance requirements.

Third, MVP claims that the Department did not explain why it diverged from the hearing officer's findings that the Southgate Project fully minimized its potential impacts on surface waters. Opening Br. at 37–39. The hearing officer wrote that "MVP has minimized impacts to surface waters and wetlands to the greatest extent practical."[12] J.A. 1349. That statement seems to conflict with the hearing officer's other statements and the language used in the Department's denial letter. *Cf.* J.A. 1349 (hearing officer recommending conditional certification or denial "to ensure that . . . all appropriate avoidance and minimization occur"); J.A. 1363 (Department concluding that "[a]pproving

---

[12] The Department and Intervenors argue that the hearing officer's findings are not binding upon the Department. *See* Resp. Br at 54–57; Intervenors' Br. at 43–45. But the issue is not whether the hearing officer's findings are binding—the issue is whether the agency adequately explained its decision given the full administrative record, which includes the hearing officer's report. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019) (noting that "[t]he Secretary [of Commerce] was required to consider the evidence and give reasons for his chosen course of action," even if the Secretary is not required to defer to the Census Bureau's technocratic experts).

construction activities and thereby allowing the most adverse environmental impacts—without certainty of the project's utility upon completion—is inconsistent with principles of minimization."). While this apparent inconsistency may be resolved by noting that the hearing officer was using the term "minimization" with respect to the specific language in a regulatory sub-provision, see J.A. 1349, the Department did not offer that or any other explanation to reconcile its conclusions with those of its officer. Accordingly, we remand for the Department to address the hearing officer's findings. *See Fred Meyer Stores, Inc. v. Nat'l Labor Relations Bd.*, 865 F.3d 630, 638 (D.C. Cir. 2017) (remanding because the agency failed to "reasonably reflect upon the information contained in the record and grapple with contrary evidence").

Finally, the Department failed to explain why it chose to deny certification instead of conditioning certification upon the Mainline Project receiving its permits. The Department's hearing officer recommended that the Department take either of those two options. On appeal, the Department—and Intervenors—explain why the State might have preferred to deny the certification. The Department states that the hearing officer's suggested condition of completion for the Mainline Project may be too vague to be enforceable. *See* Resp. Br. at 65–66. Intervenors add that MVP's acquisition of various permits for the Mainline Project provides no guarantee, given several lawsuits that later revealed deficiencies in that Project and its permits. Intervenors' Br. at 49–55. These are fair reasons why the Department may have considered it the better policy to deny certification rather than issue it conditionally. But the Department did not offer those rationales in its decision; its denial letter did not explain at all why it chose outright denial

27

over conditional certification. And the Department cannot now supplement its reasoning through representations made on appeal. *See Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). Given a choice between two options, the Department had the obligation to explain why it chose one over another. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46–47 (1983)). It did not do so here.

Thus, on remand, the Department must address the hearing officer's findings and explain why the Department chose denial over conditional certification.

## IV.

For the foregoing reasons, we grant MVP's petition, vacate the North Carolina Department of Environmental Quality's denial of certification, and remand to the Department for further proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED;*
*VACATED AND REMANDED*